UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BARBARA DOSS-CLARK,

    Plaintiff,

v.                                      CASE NO. 8:06-CV-1760-T-23MAP

BABIES AND BEYOND PEDIATRICS, P.A.,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

This is an action for damages under the ADA and COBRA. Because the Defendant has not answered the complaint or otherwise appeared, the Plaintiff has moved for default judgment pursuant to FED. R. CIV. P. 55 (doc. 12).[1] After an evidentiary hearing in accordance with FED. R. CIV. P. 55(b)(2), I recommend the district judge issue judgment by default in favor of the Plaintiff and against the Defendant in the amount of $133,517.12 and also award Plaintiff $21,789.50 in attorneys' fees.

*A. Rule 55's perspective*

Generally, the entry of a default judgment is committed to the discretion of the district judge. *Mason v. Lister,* 562 F.2d 343, 345 (5th Cir. 1977).[2] The factual allegations of a well-pleaded complaint are taken as true; hence, the court must decide if these accepted

---

[1] United States District Judge Steven D. Merryday has referred the matter to me to conduct such proceedings as necessary and issue a report and recommendation. *See* 28 U.S.C. § 636 and Local Rule 6.01(b).

[2] The Eleventh Circuit in an *en banc* decision, *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

facts state a cause of action for which relief can be granted. *Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1370 n. 41 (11th Cir. 1987); *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975) ("[t]here must be a sufficient basis in the pleadings for the judgment entered); *Descent v. Kolitsidas,* 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005) (same). Where the amount of damages due is uncertain, an evidentiary hearing is often required to determine the sum the defaulting defendant must pay. *S.E.C. v. Smyth,* 420 F.3d 1225, 1231-32 (11th Cir. 2005).

*B. Facts*[3]

Plaintiff is a registered nurse with over forty years experience in a variety of settings (emergency rooms, dermatology clinics, and pediatric clinics). In July 1997, the Defendant, Babies and Beyond Pediatrics, P.A. ("B&BP"), hired her as a triage nurse for fielding phone calls at its Spring Hill office. Dr. Bain, B&BP's owner, eventually assigned her to work the days he covered the Spring Hill office; accordingly, Plaintiff worked Monday through Wednesday from 7:30 a.m. to 6:00 p.m. Notably during her seven years with B&BP, Plaintiff never received a single disciplinary write-up or unflattering performance. *See* docs. 1 at ¶s 8-12; 10-6 at ¶s 2-4.

In January 2005, Plaintiff was diagnosed with breast cancer. After a lumpectomy, she began chemotherapy; nonetheless, she maintained her work schedule despite her treatment's debilitating effects. On May 9, 2005, and still during her course of therapy, B&BP's clinical supervisor (Peg Vizioli) visited the Spring Hill office without warning.

---

[3] These facts are taken from the Plaintiffs' complaint, her motion for application for default judgment, and the affidavits and exhibits supporting her request for default judgment.

Vizioli told the Plaintiff: "I want to offer you some good advice, because of your chemo, you should go to Social Security and get disability." *See* docs. 1 at ¶s 13-15; 10-6 at ¶ 7. Given Plaintiff's ability to work, the Plaintiff stated the obvious – she did not qualify for such benefits. Irrespective, B&BP fired her that day. Vizioli offered Plaintiff a two-week severance package and would "allow her to remain on health insurance for two months." *See* doc. 1 at ¶ 16; doc. 10-6 at ¶ 7. Moreover, she later learned that B&BP had considered restructuring her work days and hours but decided against doing so. It apparently reasoned Plaintiff would not be able to work the new schedule given her disability and treatments. *See* doc. 1 at ¶ 17.

Although she anticipated at least two months of medical coverage, the Plaintiff was erroneously informed at a June doctor's appointment that her medical coverage had been cancelled effective May 31.[4] By mid June, B&BP still had not forwarded her a COBRA election form. Consequently, on June 16 the Plaintiff sent a letter to her former employer by certified mail inquiring about the premature cancellation of her insurance; she also requested

---

[4] The Plaintiff, acting on information provided by her physicians' billing agents, contended up through the initial phase of the Rule 55 evidentiary hearing that her medical coverage terminated on May 31, 2005. But that claim conflicted with the summary of outstanding medical bills ($44,715) she included as part of her motion and reaffirmed at the evidentiary hearing. *See* doc. 10-16. It listed three months of expenses accrued before any May 31 termination, items her health insurance should have covered. In view of this inconsistency, I reopened the evidentiary hearing and convened a telephone conference with Plaintiff and her counsel about the matter. And I directed the Plaintiff to supplement her pleadings with an affidavit explaining these inconsistencies and correcting any claims if necessary. Accordingly, the Plaintiff, after again making inquiry of her physicians' billing department, learned that her medical bills through June 30, 2005, have been paid by a supplemental AFLAC policy through her employer. Therefore, the Plaintiff has reduced her claim from $44,715 in outstanding expenses to $12,012.54. *See* Plaintiff's affidavit at doc. 15-2.

a COBRA election form. B&BP ignored her demand. On October 3, the Plaintiff sent the same letter again. This time B&BP responded, but instead of including a form, it claimed it had not received her first letter. Moreover, it claimed it had sent Plaintiff an election form on May 24. Plaintiff reasonably asserts B&BP's contention was "likely a fabrication." *See* doc. 1 at ¶s 22-24; doc. 12 at ¶s 28-31.[5]

All this prompted the Plaintiff to complain to the Department of Labor about B&BP's actions. When the Department of Labor's Employee Benefit Security Administration inquired into the matter, B&BP never responded to the department's inquiries (doc. 12 at ¶ 32). In March 2006, B&BP finally sent the Plaintiff a COBRA election form. But instead of correctly noting the appropriate coverage period (June 1, 2005, through the end of December 2006), B&BP identified the period between July 10, 2006, until December 10, 2007, several months after she had concluded her chemotherapy (docs. 1 at ¶ 25; 12 at ¶ 33).

On September 25, 2006, Plaintiff, having exhausted her administrative remedies (*see* doc. 1 at ¶¶ 18-20), filed this complaint against B&BP claiming it had wrongfully terminated her because it perceived her breast cancer would interfere with her work in violation of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* She also alleged the firm had violated the notice provisions of the and Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq.* (doc. 1). A process server served the summons and complaint on B&BP's registered agent George N. Klimis (*see* doc. 4). B&BP failed to respond. Upon Plaintiff's motion, the district judge directed the clerk to

---

[5] For example, Plaintiff notes that although B&BP promised to pay her two months severance, it never paid her any amount after terminating her (doc. 1 at ¶ 22).

enter a default against B&BP (docs. 6, 7). Plaintiff now moves under Rule 55(b)(2) for a default judgment because B&BP has not answered, defended, or appeared after proper service. She seeks back pay, compensatory damages, payment of outstanding medical bills, COBRA statutory fines, attorneys' fees, and costs.

 *C. Findings*

  *1. ADA claim*

   *a. liability*

Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) she had, or was perceived to have, a "disability"; (2) was a "qualified" individual; and (3) was discriminated against because of her disability. *Carruthers v. BSA Advertising, Inc.,* 357 F.3d 1213, 1215 (11th Cir. 2004). The Act defines disability as a physical or mental impairment that substantially limits one or more of the major life activities of such individual, a record of such an impairment, being regarded as having such an impairment. 42 U.S.C. §12102(2). A "qualified individual with a disability" is one who can perform the essential functions of the position held with or without reasonable accommodation. 42 U.S.C. § 12111(8); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225 (11th Cir. 2005).

Having considered her complaint, her affidavit, the attachments in support of her

motion for default judgment, and her testimony at the hearing on damages, I find the Plaintiff makes a *prima facie* case of discrimination under the ADA. Vizioli's comments ("you should apply for Social Security disability") demonstrate B&BP perceived the Plaintiff as being disabled as that term is used in the ADA. *See* doc. 1 at ¶¶ 15, 17, 26. Undoubtedly, Plaintiff was qualified for her position and was capable of working without accommodation or with some reasonable accommodation. Her unexpected termination without any explanation evidences B&BP's discriminatory animus. Based on the evidence presented, I find Plaintiff makes out a *prima facie* case under the ADA.

### b. damages

The ADA incorporates the enforcement mechanism under Title VII. *See E.E.O.C. v. Waffle House, Inc.,* 534 U.S. 279, 286 n. 4 (2002). And successful Title VII claimants are presumptively entitled to back pay. *Lathem v. Dept. of Children and Youth Serv.,* 172 F.3d 786, 794 (11th Cir. 1999). The goal is to make the aggrieved employee financially whole for the injury suffered on account of the unlawful discrimination. *Faragher v. City of Boca Raton,* 524 U.S. 775, 805 (1998). Thus, Plaintiff may recover back pay from the date of termination until the date of the judgment, including lost salary, raises, and fringe benefits. *See* 42 U.S.C. §§ 12117, 2000e(g)(1); *Akouri v. State of Florida Dept. of Transp.,* 408 F.3d 1338, 1343 (11th Cir. 2005) (back pay is the difference between the actual wages the earned and the wages the individual would have earned but for the discrimination); *Billingsley v. Jefferson County,* 953 F.2d 1351, 1355 n. 4 (11th Cir. 1992) (back pay should extend to the date of judgment and not to the date of the court's oral findings).

Plaintiff testified she earned $11.35 an hour and averaged 30 hours a week (or

$340.50 per week). From May 9, 2005, until April 4, 2007 (the date of this report and reccomendation), marks ninety-nine weeks. Although Plaintiff turned sixty-five on June 27, 2006, she stated that she would have continued to work past that age; indeed, she looked unsuccessfully for work after her termination. Consequently, I have included as part of the back pay calculation those weeks after her sixty-fifth birthday. *See Muñoz v. Oceanside Resorts, Inc.,* 223 F.3d 1340, 1349 (11th Cir. 2000) (awarding a period of front pay past the plaintiff's retirement age appropriate based on plaintiff's testimony that he would have worked past retirement age).[6] Thus, Plaintiff is entitled to $34,349 in back pay ($340.50 x 99 weeks= $33,709.50). And Plaintiff is entitled to $4,437.93 in lost health insurance benefits B&BP (estimated at $211.33 per month for 21 months, i.e., June 2005 to date of this report; *see* doc. 10-6 at ¶ 14).

Under the ADA, a plaintiff, provided she presents evidentiary support, may be awarded compensatory damages for future pecuniary losses, emotional pain and suffering, inconvenience, and mental anguish. *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1333 (11th Cir. 1999). Here, Plaintiff seeks the statutory maximum – $50,000. *See* 42 U.S.C. § 1981a(b)(3) (B&BP has fewer than fifty employees). I find this amount appropriate and reasonable for a variety of reasons.

Because emotional harm is subjective and its evaluation by a fact-finder depends considerably on the demeanor of the witnesses, the standard of review here is deferential. In short, given B&BP's liability, the Court has "a great deal of discretion in deciding the

---

[6] While Plaintiff does not seek front pay, *Muñoz's* rationale applies equally to back pay issues.

level of damages to be awarded," and the Plaintiff need not prove them with a high degree of specificity. *Akouri,* 408 F.3d at 1344-45. Such damages may be inferred from the circumstances as well as proven by the testimony. *Id* at 1345.

In the midst of her battle with a potentially life-threatening disease, B&BP terminated Plaintiff without warning and for a discriminatory reason.[7] That act, taken at a time when she needed her employer's benefit package more than ever, impacted her severely. She understandably experienced hopelessness, uncertainty about her future, loss of self-esteem, and withdrew from normal activities and friends. Predictably, she became clinically depressed. Without medical coverage, she depended on community mental health services for treatment. She is convinced, and with good reason, that her depression robbed her of work opportunities and life's enjoyments. Her termination affected the course of her cancer treatment as well. Without medical insurance, Plaintiff relied on the generosity of her oncological group who continued to treat her. But these physicians understandably did not offer her costly drugs which could have eased her struggle through chemotherapy (Plaintiff testified had she had coverage, her physicians would have prescribed her drugs, like Neulasta ®, to combat the effects on her blood counts). For all these reasons, I find the Plaintiff should be awarded $50,000 in compensatory damages.

    *2. COBRA violation*

        *a. liability*

---

[7] Admittedly, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all." But, an employer cannot take action "for a discriminatory reason." *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984).

B&BP acted as the plan administrator under its group health plan; consequently, it was responsible for notifying discharged employees of their right to receive continuation coverage. *See* 29 U.S.C. §§ 1166(a)(4)(A), 1163(2).[8] Any notice it sent had to sufficiently apprise the Plaintiff so she could make an informed decision whether to elect COBRA coverage. *Scott v. Suncoast Beverage Sales Ltd.,* 295 F.3d 1223, 1230 (11th Cir. 2002). At the time of an employee's termination, the employer must notify the plan's administrator within thirty days of the event. 29 U.S.C. § 1166(a)(2). In turn, the plan's administrator is required to notify the former employee within fourteen days of her right to elect COBRA coverage. 29 U.S.C. § 1166(a)(4). Thus, B&BP had forty-four days to provide the Plaintiff with an election notice (i.e, July 22, 2005). Clearly, B&BP failed to meet its COBRA obligations.

### b. damages

Where COBRA violations have resulted in the loss of insurance coverage, courts have interpreted ERISA's civil enforcement statute as entitling qualified beneficiaries to compensatory damages in an amount equal to medical expenses minus deductibles and premiums. *See Fisher v. Trutech, Inc.,* 2006 WL 3791977, *3 (M.D. Ga. 2006) (applying rule in default setting); *Linden v. Harding Tube Corp.,* 2005 WL 2397033, *4 (E.D. Mich.

---

[8] These sections of COBRA were eventually codified as part of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq. See Phillips v. Saratoga Harness Racing, Inc.,* 240 F.3d 174, 177 n. 1 (2d Cir. 2001). COBRA was enacted as a legislative response to the growing number of Americans without health insurance and the reluctance of hospitals to treat the uninsured. By offering the opportunity to obtain continuation coverage, COBRA provided an alternative to prohibitively expensive individual health care insurance policies for those at risk for losing their employment-related group health due to the loss of a job or other qualifying events. *Id.* at 179.

9

2005); *Vargas v. Child. Dev. Council of Franklin County,* 269 F. Supp.2d 954, 957 (S.D. Ohio 2003); *Hamilton v. Mecca, Inc.,* 930 F.Supp 1540, 1555 (S.D. Ga. 1996). Accordingly, the Plaintiff is entitled to recover $8189.63 ($12,012.54 in medical expense minus $3,822.91 in premiums). *See* doc. 15-2.[9]

### *c. fine*

Any administrator who fails to satisfy COBRA's notice provisions may, in the court's discretion, be personally liable to the aggrieved participant or beneficiary in the amount of up to $110 a day from the date of such failure or refusal. *See* 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1 (increasing civil monetary penalty under ERISA provision from $100 to $110 for violation occurring after July 29, 1997); *Scott,* 295 F.3d at 1231-32 (standard of review on appeal is abuse of discretion). The fine's purpose under § 1132 is punitive. *Scott* at 1232 (it is "designed more for the purpose of punishing the violator than compensating the participant or beneficiary."). Both prejudice to the participant and bad faith by the administrator are relevant factors in assessing penalties. *Id.* (although the statute does not require a showing of prejudice to plaintiff, prejudice is a factor to be considered in determining an appropriate penalty); *see also Chestnut v. Montgomery,* 307 F.3d 698, 704 (8th Cir. 2002) (bad faith and harm are relevant factors); *Palmieri v. Coca-Cola Co.,* 2006 WL 2523027 *6 (M.D. Ga. 2006) (same).

As the Plaintiff persuasively asserts, both adverse factors are present here. B&BP effectively subjected the Plaintiff to the ranks of the uninsured at a time when it knew she

---

[9] Plaintiff concedes she would have abandoned COBRA coverage for Medicare when she turned sixty-five. The above expenses were incurred before she turned sixty-five.

desperately depended on her medical coverage. It ignored her timely requests about COBRA, and it shunted aside inquiries by the Department of Labor. Lastly, when B&BP did send a COBRA notice in March 2006, some seven months after it was due, it mistakenly identified the incorrect period of coverage. I find the full fine of $110 a day to be appropriate and in accordance with the purposes of the statutory scheme. Therefore, Plaintiff should be fined a total of $37,180 ($110 x 338 days).[10]

*C. Attorneys' fees*

Both the ADA and ERISA authorize awards of reasonable attorneys' fees to successful plaintiffs. *See* 42 U.S.C. § 12205; 29 U.S.C. § 1132(g)(1). But unlike for the prevailing plaintiff under the ADA, ERISA offers no presumption in favor of fees and costs. *Wright v. Hanna Steel Corp.*, 270 F.3d 1336, 1344 (11th Cir. 2001). Instead, the Eleventh Circuit outlines the factors a district judge should consider when evaluating fee requests in an ERISA matter:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; (5) [and] the relative merits of the parties' positions.

*Id.* (citing cases).

---

[10] Plaintiff suggested the fine should be up to the date of the hearing. I find this inappropriate. Because Plaintiff concedes she would have discontinued her COBRA coverage (had it been available) when she turned sixty-five, it would not serve any statutory purpose to penalize the B&BP after that period. Hence, 338 days covers from July 23, 2005 (the day after the COBRA election notice was due) through June 26, 2006 (the day before Plaintiff turned sixty-five and became eligible for Medicare).

The Plaintiff meets these demands and should be awarded attorneys' fees for her ADA and ERISA claims.

Accordingly, the starting point in fashioning an award of attorney's fees is to multiply the number of hours reasonably expended by a reasonable hourly rate. This "lodestar" may then be adjusted for the results obtained. *Duckworth v. Whisenant,* 97 F.3d 1393, 1396 (11th Cir. 1996); *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1303 (11th Cir. 1988). Plaintiff has submitted satisfactory evidence establishing both that the requested rates are in accordance with the prevailing market rates and that the hours expended are reasonable. *Duckworth* at 1396; *Norman* at 1303.[11] Therefore, I find she should be awarded $21,789.50 in fees.[12] As for any costs incurred, Plaintiff should file a bill of costs in accordance with FED. R. CIV. P. 54.[13]

---

[11] For rates, the applicant usually meets her burden by offering direct evidence of rates charged under similar circumstances or expert opinion. *Norman* at 1303. And, if the moving party presents inadequate documentation to support her claim, the court can rely on its own experience or affidavits in the record. *Mills by Mills v. Freeman,* 118 F.3d 727, 734 (11th Cir. 1997); *Norman* at 1303. Here the Plaintiff offers the affidavits two local attorney attesting to the reasonableness of the rates and hours charged.

[12] In her motion for default judgment, Plaintiff outlined the hours and hourly rates expended by her attorneys and paralegals through January 31, 2007 (doc. 12 at ¶¶ 41-44). At the Rule 55 evidentiary hearing, she updated her motion by itemizing the fees incurred up to the hearing date; moreover, Plaintiff's counsel corrected fee charges previously quoted for May 2006 and February 2007. Both of these corrections revised the amounts charged downward. *See* "First Revised Summary of Doss-Clark's Attorneys' Fees."

[13] Despite the fact that 28 U.S.C. § 1920 allows the Court or the Clerk to tax costs, FED. R. CIV. P. 54(d)(1) makes plain the Clerk taxes initially. Commentators have observed "[t]he function of the court [pursuant to Rule 54(d)(1)] in the process of taxing costs is merely to review the determination of the clerk. Therefore, nothing normally can come before the court until the clerk has acted and an objection has been made." 10 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2679 (3d ed. 1998); *accord Sharon v. Yellow Freight Sys., Inc.*, 985 F. Supp. 1274, 1275 (D. Kan. 1997) (the clerk taxes the costs). A "motion to tax costs" runs

*D. Conclusion*

For the reasons stated, it is hereby

RECOMMENDED:

1.  Pursuant to Fed. R. Civ. P. 55(b)(2), that judgment by default be entered in favor of the Plaintiff and against the Defendant in the amount of $133,517.12.[14]

2.  That Plaintiff be awarded $21,789.50 in fees.

IT IS SO REPORTED in Tampa, Florida on April 4, 2007.

*/s/ Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (*en banc*).

Copies furnished to:

The Hon. Steven D. Merryday
Counsel of Record

---

counter to Rule 54(d)(1), insofar as a "motion" is "[a]n application *to the court* for an order." FED. R. CIV. P. 7(b) (emphasis added). Admittedly, Local Rule 4.18, supports the filing of a motion ("all claims for costs or attorney's fees ... shall be asserted by separate motion or petition filed not later than fourteen (14) days following the entry of judgment"). Regardless, because Local Rule 4.18 conflicts with Rule 54, Rule 54 controls. *See* FED. R. CIV. P. 83(a)(1) (Local Rules are to be consistent Federal Rules of Civil Procedure).

[14] This amount includes the following sums: $33,709.50 (back pay under the ADA), $4,437.93 (loss health insurance benefits), $50,000 (compensatory damages under the ADA), $8,189.69 (COBRA award for outstanding medical expenses), and $37,180 (COBRA fines).